FILED

2015 Sep-25  AM 09:01
U.S. DISTRICT COURT
N.D. OF ALABAMA



## THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **WWH INVESTMENTS, PAUL WALKER, CAPABLE TECHNOLOGY SOLUTIONS, LLC,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | **Case No._____** |
| ) | **JURY TRIAL DEMANDED** |
| **SECUREDPAY SOLUTIONS, INC., ROY NELSON, individually, and in his capacity as Chairman of SecuredPay Solutions, Inc., CHRIS FAIRCLOTH, individually, and in his capacity as President and Director of SecuredPay Solutions, Inc., and STEVE MCQUAIG, individually, and in his capacity as a Director of SecuredPay Solutions, Inc.** ) | |
| ) | |
| **Defendants.** ) | |

## VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs WWH Investments ("WWH"), Paul Walker and Capable Technology Solutions, LLC ("CTS" and, together with WWH and Paul Walker, "Plaintiffs"), both directly and on behalf of SecuredPay Solutions, Inc. ("SPS" or the "Company"), submit this Verified Complaint for Damages and Injunctive Relief against Defendants SPS, Roy Nelson ("Nelson"), Chris Faircloth ("Faircloth"), and Steve McQuaig ("McQuaig" and together with Nelson and Faircloth, the "Individual Defendants"), and state as follows:

1

## **INTRODUCTION**

The Individual Defendants are Directors of SPS, a close-corporation that holds valuable intellectual property rights to an electronic payment device. Defendants Nelson and Faircloth lured WWH to invest significant sums of money in SPS and then operated the Company for the sole purpose of enriching themselves (largely through undisclosed sales of their own stock), while failing to make any effort to further the interests of SPS itself.  In January 2015, SPS's former CEO, Richard Fleming, disclosed the results of an investigation he had undertaken during his short, six (6) month employment.  It was then that WWH and its members learned for the first time that, over the previous ten years, Nelson and Faircloth had committed gross malfeasance and overt breaches of their respective fiduciary duties.  Mr. Fleming's reports show that Nelson and Faircloth: siphoned corporate funds for their personal benefit; engaged in self-dealing; disseminated false information to WWH, SPS's other minority shareholders and potential investors; failed to protect SPS's valuable intellectual property from infringement, which is ongoing; failed to exploit SPS's intellectual property rights or otherwise advance the Company's business interests in any way; concealed all records and evidence of their misconduct; and breached numerous other fiduciary duties as both officers and Board members.  McQuaig

had knowledge of, was complicit with, and actively participated in furthering Nelson's and Faircloth's schemes.

This malfeasance was only made possible by the Individual Defendants' absolute control over SPS's Board of Directors and their collective ownership of the majority of the Company's voting stock.  The exposure of this malfeasance was only made possible by Mr. Fleming's disclosures to SPS's shareholders in January 2015, just before he resigned.  Plaintiffs bring this action to salvage SPS and to hold the Individual Defendants accountable for their exploitation of the Company.

## PARTIES

1.      WWH is a Tennessee general partnership between Paul Walker and his son, Jeff Walker.  Its principal place of business is located in Franklin, Tennessee.

2.      Jeff Walker is an adult resident citizen of Franklin, Tennessee.  He was a member of SPS's Board for three (3) years, between 2011 and 2014, when he resigned.

3.      Paul Walker is an adult resident citizen of Pulaski, Tennessee.

4.      CTS is a Tennessee limited liability company with its principal place of business in Franklin, Tennessee.  WWH owns a 79% interest in CTS.  Mark

Champion, an adult resident citizen of Nashville, Tennessee, owns the remaining 21% interest in CTS.

5.      SPS is an Alabama corporation with its principal place of business in Pisgah, Alabama.  SPS's Board of Directors is currently composed of five (5) members: the Individual Defendants (Nelson, Faircloth and McQuaig), Lance Larsen ("Larsen"), and John Johnson ("Johnson").

6.      Nelson is an adult resident citizen of Pisgah, Alabama.   He is Chairman of SPS's Board.

7.      Faircloth is an adult resident citizen of Macon, Georgia.   He is President of SPS and a member of its Board.

8.      McQuaig is an adult resident citizen of Milledgeville, Georgia.   He is a member of SPS's Board.

## JURISDICTION AND VENUE

9.      The Court has personal jurisdiction over Nelson because he is a resident citizen of Alabama and regularly transacts business in the State due to his membership and vast contacts with SPS, an Alabama corporation.  The Court has personal jurisdiction over Faircloth and McQuaig because they regularly transact business in Alabama due to their membership on SPS's Board and vast contacts with SPS.   The Court has jurisdiction over SPS because it is an Alabama corporation and a requisite defendant pursuant to FED. R. CIV. P. 23.1.  The Court

4

has jurisdiction over the subject matter of this action because Plaintiffs and Defendants are diverse for purposes of 28 U.S.C. § 1332 and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.  Venue is proper in this Court, as SPS's principal place of business is located in the Northern District of Alabama, Northeastern Division.

## FACTS

### WWH'S INVESTMENT IN SPS

11.  The Individual Defendants and Johnson formed SPS on January 3, 2005, ostensibly for the purpose of designing, creating, selling and distributing a self-contained, handheld wireless payment processing device and associated proprietary software (the "Device").  Nelson and Faircloth were purportedly the "idea" founders.  Larsen (who was later brought in) and Johnson served the technical role of creating the Device itself.  Treasury shares were created for the purpose of raising operating capital from investors in SPS.

12.  In the fall of 2006, Faircloth approached Jeff Walker about becoming an investor in SPS.  At the time, Jeff Walker had known Faircloth for approximately five (5) years and considered him a friend.  Faircloth explained to Jeff Walker that SPS had developed the Device and asked him to attend a presentation in Atlanta, Georgia (the "Atlanta Presentation").

13.  Jeff Walker and his father, Paul Walker, went to the Atlanta Presentation, where Nelson and Faircloth demonstrated a prototype of the Device.

They showed how the Device could be used as a wireless "pay at the table" restaurant payment system for debit cards. The Device was unique because it allowed a restaurant to avoid merchant fees charged by credit card companies, and provided more security to the cardholder, because the card never left the customer's presence and the Device did not retain the debit card information.

14.     At the Atlanta Presentation, Nelson and Faircloth represented that they intended to use the capital raised through the sale of SPS's stock to exploit and protect the Device's proprietary technology and otherwise pursue all available business opportunities.

15.     Unbeknownst to the Walkers, Nelson and Faircloth never intended to operate SPS as a legitimate enterprise or otherwise attempt to introduce the Device to the marketplace. Instead, their goal was to use SPS to line their own pockets with potential stockholders' investments.

16.     In January 2007, WWH agreed to purchase 100 shares of SPS stock for $1,000,000. This investment consisted of an initial $500,000 payment and ten monthly payments of $50,000. WWH's investment was a critical precedent used by Nelson and Faircloth to persuade others to invest in SPS.

17.     WWH and its members believed at the time they were purchasing shares directly from SPS, as opposed to stock held by Nelson or Faircloth. The Individual Defendants have repeatedly refused to produce a stock register. Upon

information and belief, the shares purchased by WWH in January 2007 were those held by Nelson, Faircloth and/or Faircloth's wife.  The vast majority, if not all, of the money was used to enrich these individuals, as opposed to funding SPS's business operations.

18.    Between June 2007 and September 2009, Faircloth requested that WWH buy more stock.  WWH purchased an additional 102 shares of SPS stock for $335,000.

19.    At various other times, Faircloth also requested that WWH purchase SPS stock from other shareholders.  At one time, WWH owned a total of 182 shares of SPS stock.  However, WWH sold some of its stock and currently owns 135 shares.  This represents approximately 13.5% of SPS's voting stock.  WWH paid $823,500 for the voting shares it currently owns.

20.    A small portion of WWH's investment funds was used to secure four valuable patents, which represent the unique character of the Device:

US Patent No. 7,721,969 (awarded May, 2010)
US Patent No. 8,011,587 (awarded September, 2011)
US Patent No. 8,356,754 (awarded January, 2013)
US Patent No. 8,490,878 (awarded July, 2013)

(the "Patents").

21.    For the last ten years, WWH has patiently waited for SPS to provide a return on its investment by exploiting the Device and its underlying proprietary technology, including the Patents.  As a result of a 2015 investigation by SPS's

former CEO, the Walkers and WWH now know this will never occur while the Individual Defendants have control of the Company.

## THE 2015 INVESTIGATION

22.    In July 2014, Nelson's wife, Virginia, became concerned about the Individual Defendants' conduct, their failure to govern SPS in any way, and her husband's potential liability.  As a result, she forced Nelson to hire a CEO who would run SPS in a lawful and orderly manner.

23.    Thereafter, Nelson and Faircloth held an "unofficial board meeting" in Orlando, Florida to interview Richard Fleming ("Fleming") for the position.  Board members Johnson and Jeff Walker were intentionally excluded from the meeting and were given no notice it occurred.  Upon information and belief, McQuaig had knowledge of the meeting, but did not attend.

24.    As a result of the meeting, the Individual Defendants hired Fleming as SPS's CEO in August 2014.  They instructed him that one of his goals was to oust Jeff and Paul Walker from SPS (and Jeff from the Board) because they were "disliked and not team players."

25.    Although Fleming never asked for his resignation, Jeff Walker resigned from the Board.

26.    During his first six weeks with the Company, Fleming attempted to gain an understanding of SPS's operations.  He repeatedly requested various

financial and corporate records from the Individual Defendants.  They refused to provide them.

27.     However, Fleming, who is an attorney, gleaned enough information to "become aware of issues related to stock sales, potential insider self-dealing, potential violations of officer and director's fiduciary obligations and other serious matters."

28.     On November 18, 2014, Fleming sent Nelson a draft memorandum regarding the state of the Company.  In it, Fleming criticized the Individual Defendants for refusing to provide him with SPS's financial and corporate records, especially since he was the Company's CEO.

29.     Nelson "was extremely upset" when he received the draft and agreed to give Fleming unfettered access to SPS's financial and corporate records if Fleming met with him in Orlando.  In exchange, Fleming did not distribute the draft memorandum to the Board.

30.     In December 2014, Nelson met Fleming in Orlando as promised. However, Nelson either could not or would not provide critical financial and corporate records of SPS (despite that Fleming had been requesting them for almost six months), including: articles of incorporation, bylaws, minutes of shareholder meetings, cash flows, check registers, notes payable, notes receivable, and the stock register.

31.     During the meeting, Fleming expressed concerns regarding Faircloth's conduct as an officer and Director of SPS.  Nelson conceded that Faircloth "was driven primarily by his financial needs and that this would often cause him to do whatever he needed to do to meet those needs."  Nelson told Fleming he expected Faircloth to resign by January 1, 2015.

32.     Fleming honored Nelson's request and revised his memorandum to exclude many of his criticisms, ultimately delivering it to Nelson and the Board on January 5, 2015 (the "January 5 Memo").  Even so, the January 5 Memo criticized the Individual Defendants for selling their own stock to investors (and pocketing the money), instead of selling treasury shares and using the money to fund SPS's operations.  It also highlighted that money was being provided to individuals with titled positions in SPS in the form of loans and gifts, and that SPS employees had no regular compensation.  Finally, the January 5 Memo discussed various corporate governance issues and provided recommendations to the Board, including a suggestion that it obtain Faircloth's resignation (since he did not resign per Nelson's representation).

33.     The Board took no action in response to the January 5 Memo. Therefore, on January 21, 2015, Fleming sent a second memorandum to SPS's Board (the "January 21 Memo").  In it, Fleming reiterated that the Individual Defendants still refused to provide SPS's financial and corporate records to him,

10

even though he was the CEO.  Fleming also noted that their refusal to provide financial and corporate records had already caused Jeff Walker's resignation from the Board in 2014.

34.    The January 21 Memo further chronicled Fleming's unsuccessful attempt to run SPS in spite of the Individual Defendants' conduct.  Fleming observed, among other things, that SPS failed to observe rules for corporate governance, raise operating capital and document transactions with officers.  The January 21 Memo called for SPS's Board to "recognize the blinding nature of greed" and recommended that it: (1) secure all financial and corporate records; (2) audit those records; (3) secure a competent attorney; and (4) terminate Faircloth.

35.    SPS and its Board again took no action after receiving the January 21 Memo.   As a result, Fleming tendered his written resignation on January 25, 2015 (the "Fleming Resignation").  In it, he cited, among other things:

   a.    The most critical information for a new CEO to have includes the financial records, corporate records and founding documents, and the stock registry.  As of this date, I have not received the financial or corporate records and have only received a partial or incomplete document purporting to be the stock registry.

                           *        *        *

   b.    I believe there are a sufficient number of allegations and incidents to lead one to conclude that the Board of Directors is incapable of providing capable governance that will protect the investments made by many of the SPS Stockholders.

    c.      I believe there are a sufficient number of allegations, incidents, and documents to lead one to conclude that the Chairman of the Board (Nelson) and one or more directors (Faircloth) have engaged in conduct that is a violation of the fiduciary duties required of any individual who holds those positions of governance in a C-Corporation.

    d.      I believe that the recommendations that I have made in the two Memos referred to above are unlikely to be properly considered and implemented until the Chairman (Nelson) and the Director referred to in the Memos (Faircloth) resign from their positions in the governance of SPS. . .

    e.      I have tried to communicate the need for these changes to the Chairman (Nelson) due to the fact that I am aware of several parties who may be interested in entering into discussions relative to the purchase of SPS or its IP assets, but who have stated that they will not have discussions with the Chairman or the Director that I have referred to previously.  They have explained their reasons for taking this position.  Essentially, they do not wish to enter into discussions with individuals that they would not consider trustworthy.

*     *     *

    f.      Lastly, unless the recommended changes in the Memos are made, I refuse to allow, by my presence, anyone to be misled into thinking that I am endorsing the conduct and conditions that are referenced in my memos.

*     *     *

    g.      In all the years that I have worked with a business in the stage SPS finds itself, I have never found such poor governance, misleading information, failure to cooperate, and potential self-dealing as I have found at SPS.

36.    The Fleming Resignation confirmed that the Individual Defendants totally control SPS.

37.   All of the foregoing information was unknown to WWH and the Walkers until they obtained copies of the January 5 Memo, the January 21 Memo and the Fleming Resignation in the spring of 2015.   This information was intentionally concealed by the Individual Defendants.

### FAILURE TO PROTECT AND EXPLOIT SPS'S INTELLECTUAL PROPERTY

38.   The Individual Defendants have used their control over SPS to line their own pockets, instead of exploiting the Patents for the benefit of SPS and its shareholders.   Since obtaining the Patents, the Individual Defendants have done nothing to advance the business of the Company.   To the contrary, the Individual Defendants have acted in a manner directly contrary to the best interests of SPS and have actively prevented the Company from profiting from, or even protecting, the Patents.   The patented technology is within the fast-paced, evolving digital industry.   If the Individual Defendants are not enjoined, the Device and its technology will become obsolete and worthless.

39.   To this point, in or around 2012, SPS and its shareholders became aware that there were individuals and/or entities infringing upon the Patents.   In early 2013, SPS engaged a highly reputable law firm to pursue the infringers.   The law firm was retained on a contingency basis at no cost to SPS.   However, the engagement letter provided that if SPS terminated the law firm before any recovery, it would repay the firm for its work on an hourly basis.   The law firm

provided hard copies of invoices to SPS throughout its engagement to represent its fees that would be owed in the event SPS terminated the firm.

40.     The law firm diligently worked to pursue the infringers and brought at least one lawsuit on behalf of SPS. Just as the law firm's efforts were beginning to show promise, the Individual Defendants and Larsen inexplicably voted to terminate the engagement.   Jeff Walker, who was on the Board at the time, and the only other independent director (Johnson), strongly objected and insisted that the Board protect the Patents by preserving SPS's engagement with the law firm.  The Individual Defendants and Larsen refused, and used their majority control to force the termination.  Doing so allowed the Individual Defendants to conceal their illicit activities, including some that Fleming later discovered and disclosed in his memorandum.

41.     Terminating the law firm not only allowed the continued infringement of the Patents, but it also exposed SPS to hundreds of thousands of dollars in liability to the law firm.  The Individual Defendants and Larsen decided on behalf of SPS not to pay the law firm's bill, which has exposed SPS to legal liability. Since terminating the firm, the controlling majority of SPS's Board (the Individual Defendants and Larsen) have decided to take no action to pursue infringers or otherwise protect the Patents.

### DEMAND FUTILITY; THE INDIVIDUAL DEFENDANTS' CONTROL OF THE BOARD

42.  Demand on SPS's Board would be entirely futile, given that the Individual Defendants (who currently represent a majority of its members) have, among other things: (i) declined to act on any of the matters set forth in the January 5 Memo, January 21 Memo and Fleming's Resignation; (ii) demonstrated an extreme and unwavering disregard for the interests of SPS; (iii) knowledge that their misdeeds and resulting liability would be the very subject of any demand; (iv) repeatedly denied books and records requests by shareholders; and (v) total control over Larsen.

43.  Nelson and Faircloth have, at all times, controlled every facet of SPS, including other Board members.  Both have been Directors since the Company was founded.  As set forth above, Nelson and Faircloth have never considered or in any way furthered the interests of SPS.  To the contrary, from day one, their sole intention has been to use SPS as a medium through which to sell their individual stock in the Company.  They enriched themselves at the expense of what could and should be an otherwise thriving company.  Nelson and Faircloth could not conceivably act upon a demand by the shareholders in an objective or disinterested manner because the basis of a demand would be directed to their own self-dealing, fraud, and disregard of SPS and its shareholders.  Put differently, there is an overt and extreme degree of antagonism between the interests of Nelson and Faircloth,

on the one hand, and SPS, on the other, such that Nelson and Faircloth would be incapable of objectively reviewing a demand to the Board.

44.     These truths have already been demonstrated.  As stated, in the January 5 Memo and January 21 Memo, Fleming revealed Nelson's and Faircloth's overt malfeasance and requested that it be cured.  The Individual Defendants, as a controlling majority of the Board, refused to take any action whatsoever in response.  Fearing he would be perceived as complicit with Nelson and Faircloth's conduct if he remained at SPS, Fleming terminated his engagement and set forth the very reasons why in the Fleming Resignation.  Again, the Individual Defendants refused to make a single change.  A formal demand upon Nelson and Faircloth would parallel and highlight the same issues addressed in the three documents Fleming addressed to the Board.  As such, demand upon Nelson and Faircloth would be futile.

45.     McQuaig has been a member of SPS's Board since November 2012. Faircloth and McQuaig have been close family friends for more than twenty (20) years.  McQuaig's loyalty to Faircloth as a long-time friend crossed over in equal measure to the business of SPS.  Indeed, Nelson and Faircloth have total control over McQuaig in his role as a Director.  Moreover, McQuaig has played an active and necessary role in Nelson's and Faircloth's schemes since joining the Board.

46.    For instance, prior to Board meetings, Nelson, Faircloth and McQuaig have private calls and meetings to ensure that the three vote together on all matters coming before the Board.  In order to conceal their illicit activities and further their goals, Nelson and Faircloth manipulate, pressure and intimidate McQuaig during these secret conferences.  Consequently, McQuaig always votes in accord with Nelson and Faircloth.  In sum, McQuaig is beholden to Nelson and Faircloth to such a degree that he has no personal discretion of his own as it pertains to the interests of SPS.

47.    In addition, McQuaig himself participated in and has extensive knowledge of Nelson's and Faircloth's misconduct.  For instance, Nelson, Faircloth and McQuaig met with Fleming during Fleming's first six (6) weeks as CEO.  Fleming raised concerns with them regarding the extent to which Faircloth was selling stock at increasingly high prices, despite the fact that SPS never generated revenue or otherwise exhibited a foundation upon which to base the valuations.  Fleming also raised the concern that the stock being sold was that held by certain of SPS's founding members, officers and directors, as opposed to SPS selling its treasury stock to generate operating capital.  McQuaig informed Fleming that Faircloth had been very successful at finding investors who would purchase SPS stock at high prices and that this information should be withheld from other Directors and shareholders.

17

48.     At every turn and in every situation, McQuaig has sought to conceal his wrongdoing and that of those to whom he is beholden – Nelson and Faircloth – even to this day.  In February 2015, Jeff Walker, frustrated by the Individual Defendants' refusal to do anything to further SPS's business, sent an email to McQuaig asking for the opportunity to discuss certain questions Jeff Walker had. In turn, McQuaig presented the email to Nelson and Faircloth to determine whether or how to respond.  Upon information and belief, Nelson and Faircloth told McQuaig not to communicate with Jeff Walker.

49.     And, as is the case with Nelson and Faircloth, McQuaig failed to take any action in response to the very serious issues raised by the January 5 Memo, January 21 Memo, and Fleming Resignation.  That is, he refused to put the best interests of SPS ahead of his allegiance to and complicity with Nelson and Faircloth.

50.     The existence and degree of control that Nelson and Faircloth exercise over McQuaig and others is supported by Fleming's observations.  As shown above, during his tenure as CEO, Fleming was the first to bring to light both the Individual Defendants' misconduct, as well as the entire Board's repeated failure to act in SPS's best interests.  In the Fleming Resignation, Fleming states, "I have spent a significant amount of time working in good faith for SPS and am extremely disappointed at the lack of support that I have received from those two individuals

18

(Nelson and Faircloth) *that control just about everything at SPS*." (emphasis added).

51.     Fleming's observations with respect to Nelson's and Faircloth's control over SPS as a whole apply equally to McQuaig.  McQuaig's direct allegiance to Nelson and Faircloth and his participation in their misdeeds demonstrate that he has totally abandoned his duties as a Director and is antagonistic to the interests of SPS.  As such, demand upon McQuaig would be futile.

52.     Larsen has been a member of SPS's Board since shortly after the Company was founded.  Larsen is totally beholden to the Individual Defendants and has been from the beginning.  Prior to Board meetings, Nelson often calls Larsen for the purpose of manipulating him to vote with the Individual Defendants. The Individual Defendants have controlled Larsen, in part, by withholding information from him relevant to a particular vote if they believe he will not abide by their wishes.

53.     More significantly, Larsen has at all times placed the avoidance of conflict with the Individual Defendants over having an independent voice or analyzing a particular vote from a business perspective.  Larsen has stated in numerous emails that Board members should just "get along" with and avoid dissension with Nelson and Faircloth.  This is not surprising, as Larsen is not a

businessman, and he does not possess the qualifications to serve as a Director.  As stated above, Larsen's sole contribution to SPS is his expertise in digital technology.  He has no experience or training to direct the course of a business.  As such, he always defers to the judgement of Nelson and Faircloth.  This, combined with Larsen's fear of conflict with the Individual Defendants, has resulted in their total control over Larsen and the removal of any independent judgment.

54.    Larsen has also shown that he is not independent by his failure to take any action to stop Nelson's and Faircloth's wrongdoing.  Again, on three separate occasions, Fleming provided clear evidence that Nelson and Faircloth were committing egregious breaches of fiduciary duty.  In response, Larsen did nothing and has done nothing to protect SPS interests.  His fear of crossing Nelson and Faircloth prevents him from doing so.  Therefore, demand upon Larsen would be futile.

55.    After Fleming's involvement with all the Directors, including bearing witness to them failing to take any action with respect to Nelson's and Faircloth's lawlessness, he reached the conclusion that the entire Board was at odds with SPS's interests.  In the Fleming Resignation, he states, "I believe there are a sufficient number of allegations and incidents to lead one to conclude that *the Board of Directors is incapable of providing capable governance that will protect the investments made by many of the SPS Stockholders*."  (emphasis added).

56.    If not the whole Board, at least four (4) of the five (5) current Board members are not independent, are not disinterested and place their individual interests over those of SPS.  Based on the foregoing, it is clear that demand upon SPS's Board would be futile.

PLAINTIFFS' LOANS TO THE DEFENDANTS

57.    In addition to WWH's investment in SPS, certain Plaintiffs also made loans to SPS and Faircloth.  These loans are past due, and SPS and Faircloth have failed to pay them.

58.    Between September 2, 2010 and January 9, 2013, WWH loaned a total of $95,000.00 to SPS at an interest rate of twelve percent (12%).  The loan is currently in default.   As of August 31, 2015, SPS owes WWH $114,670.08 pursuant to this loan, giving credit to SPS for past payments made by SPS in cash and/or stock.

59.    On or about August 6, 2013, pursuant to a signed Promissory Note, CTS loaned $20,000 to SPS.  Each of SPS's six named directors at the time agreed to be jointly and severally liable on the loan. The interest rate was nine percent (9%).  The directors agreed to pay monthly interest expenses of $150 each every

six months to CTS.  In February and March, 2015, Nelson and Faircloth failed to make their payments.[1]

60.    This loan is also in default.  As of March 31, 2015, SPS owed CTS $20,300.00 pursuant to this loan, giving credit for payments made.

61.    Between February 26, 2010 and January 11, 2013, WWH loaned Faircloth, or advanced on behalf of Faircloth, a total of $162,000.  This loan is also in default.  As of March 31, 2015, Faircloth owed WWH $162,000.00 pursuant to this loan/advance.

62.    Between December 19, 2012 and July 10, 2013, Paul Walker loaned a total of $110,000.00 to Faircloth.  This loan is also in default.  As of March 31, 2015, Faircloth owed Paul Walker $110,000.00 pursuant to this loan.

<u>COUNT I</u>
<u>BREACHES OF FIDUCIARY DUTIES</u>
(Individual Defendants)

63.    The foregoing allegations are incorporated by reference as though fully set forth herein.

64.    As officers and directors of SPS, the Individual Defendants owed fiduciary duties to SPS and its shareholders to act in the best interests of SPS, and not to place their own interests ahead of those of SPS.  The Individual Defendants

---

[1] CTS did receive $300 a payment at this time from <u>SPS</u>, but did not accept it.  Per the terms of the Promissory Note, Nelson and Faircloth are individually responsible to satisfy the monthly installments. CTS believed these payments to be inappropriate and representative of Nelson's and Faircloth's pattern of self-dealing.

owed SPS and its shareholders the highest duties of loyalty, care, candor and good faith and fair dealing.

65.    The Individual Defendants breached their fiduciary duties to SPS, WWH and other shareholders by acting and/or failing to act as described above. These acts and omissions included, but were not limited to: (a) failing to comply with Alabama law regarding corporate governance, including failing to hold annual shareholders' meetings or elections for members of the Board; (b) wrongfully paying themselves excessive distributions and siphoning SPS's corporate funds; (c) failing to pursue legitimate business opportunities on behalf of SPS; (d) failing to protect SPS's valuable intellectual property, including the Patents; (e) terminating SPS's relationship with the referenced law firm; (f) distributing corporate funds from SPS to themselves without providing WWH its pro-rata return; (g) wrongfully withholding dividends and/or distributions from WWH; (h) using SPS's assets for their own benefit to the exclusion of the other shareholders; (i) entering into self-dealing transactions for their own benefit; (j) failing to maintain financial and corporate records; (k) denying shareholders and Board members access to financial and corporate records; and (l) otherwise operating SPS as their alter ego.

66.    The Individual Defendants' actions constitute gross negligence and waste.  Their breaches of fiduciary duties are so severe that they should not be

23

permitted to hold positions with SPS with fiscal or fiduciary responsibilities, including serving as officers or directors of SPS.

67.    As a result of the Individual Defendants' breaches of fiduciary duties, WWH has suffered and will continue to suffer substantial financial harm.

## COUNT II
## MINORITY SHAREHOLDER OPPRESSION
### (Individual Defendants)

68.    The foregoing allegations are incorporated by reference as though fully set forth herein.

69.    The Individual Defendants and the other Board members under their control hold a majority of the voting shares of SPS.  As a result, the Individual Defendants have a duty not to oppress WWH.

70.    As a minority shareholder, WWH has a right to fair treatment by the Individual Defendants, who are the controlling shareholders of SPS.  WWH's rights include, among other things, the right and expectation to share proportionately in SPS's corporate gains.

71.    In its capacity as a minority shareholder of SPS, WWH's reasonable expectation was that SPS would comply with Alabama laws regarding corporate governance; SPS would pursue reasonable business opportunities; SPS would protect its Patents and other valuable intellectual property; WWH would receive its proportionate share of any return on its substantial investments in SPS, consisting

of dividends, distributions, and/or profits of SPS; and WWH would have the opportunity to sell its shares unencumbered by the Individual Defendants' self-dealing. This has proven not to be the case. The Individual Defendants ignored Alabama law regarding corporate governance; failed to pursue SPS's business opportunities; failed to protect SPS's Patents and other valuable intellectual property; and acted to oppress WWH, frustrate WWH's investment expectations and benefit themselves at WWH's expense. Furthermore, the Individual Defendants acted in concert to ensure that distributions, dividends, and/or profits were being paid to themselves, but not to WWH or other minority shareholders.

72. The Individual Defendants' above-described acts constitute shareholder oppression. They have attempted to "squeeze out" minority shareholders, including WWH, from legitimate participation in the management of SPS and deprive them of their pro-rata share of the Company's gains. Because of the limited marketability of WWH's shares in SPS and the ability of the Individual Defendants to control the corporate decision-making and distributions of corporate funds, WWH has been prohibited from realizing any value from its investments.

73. As a direct and proximate result of the Individual Defendants' wrongful and oppressive conduct, WWH has suffered and will continue to suffer substantial monetary damages.

74.    The Individual Defendants' oppression is so severe that none of them should be permitted to maintain any position with SPS with fiscal or fiduciary responsibilities, including serving as officers or directors of SPS.

## COUNT III
### SHAREHOLDER DERIVATIVE ACTION
**(Individual Defendants)**

75.    The foregoing allegations are incorporated by reference as though fully set forth herein.

76.    WWH brings this cause of action derivatively to redress injuries suffered by the Company as a direct result of the breaches of fiduciary duties by the Individual Defendants.

77.    The Individual Defendants' breaches of fiduciary duties include, but are not limited to: (a) failing to comply with Alabama law regarding corporate governance, including failing to hold annual shareholders' meetings or elections for members of the Board; (b) wrongfully paying themselves excessive distributions and siphoning off SPS's corporate funds; (c) failing to pursue business opportunities on behalf of SPS; (d) failing to protect SPS's valuable intellectual property, including the Patents; (e) terminating SPS's relationship with the referenced law firm; (f) distributing corporate funds from SPS to themselves without providing WWH its pro-rata return; (g) wrongfully withholding dividends and/or distributions from WWH; (h) using SPS's assets for their own benefit to the

exclusion of the other shareholders; (i) entering into self-dealing transactions for their own benefit; (j) failing to maintain financial and corporate records; (k) denying shareholders and Board members access to financial and corporate records; and (j) otherwise operating SPS as their alter ego.

78.     WWH owned SPS stock continuously during the time of the wrongful course of conduct by the Individual Defendants alleged herein and continue to hold such shares.

79.     WWH will adequately and fairly represent the interests of SPS and its shareholders in enforcing and prosecuting its rights.

80.     This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

81.     WWH cannot demand that the Board pursue these claims on behalf of SPS.   Nelson and Faircloth control the Board and SPS.   Fleming repeatedly advised the Board regarding the allegations contained herein and the Board took no action – other than to accept his resignation.   It is clear that any demand upon the Board of SPS would be futile because the Board is controlled by the Individual Defendants, whose extensive wrongdoing is alleged herein.

82.     The Individual Defendants have breached their fiduciary duties to SPS, WWH, and SPS's other minority shareholders.

83.     As a result of the actions of the Individual Defendants, SPS has been and will continue to be damaged.

84.     SPS, WWH, and SPS's other minority shareholders have no adequate remedy at law.

### COUNT IV
### CONSPIRACY
### (Individual Defendants)

85.     The foregoing allegations are incorporated by reference as though fully set forth herein.

86.     As set forth above, the Individual Defendants recklessly, willfully and intentionally conspired with one another in callous disregard for the rights and interests of SPS and its shareholders to accomplish an unlawful end or to accomplish a lawful end by unlawful means. The Individual Defendants agreed to commit each of the wrongful and tortious acts discussed above, including, but not limited to, self-dealing and various other breaches of fiduciary duty to SPS and its shareholders.

87.     The Individual Defendants devised a plan to accomplish their ends. The intent and purpose of the conspiracy, and the underlying combinations of unlawful acts and misconduct committed by Defendants, was to enrich themselves by: (i) forming and using SPS as a "shell" to lure investors, such as WWH; (ii) transferring all stock proceeds to themselves, while disregarding SPS' need for

operating capital; (iii) creating the false impression that, as officers and directors, they were working to advance the interests of SPS and its shareholders; (iv) exercising total control over the Board so as to remove any hindrance to their illicit goals or any dissent to their votes; and (v) engaging in a concerted effort to conceal all evidence of their impropriety.

88.    The Individual Defendants had a financial motive and/or incentive to accomplish the conspiracy, that being to enrich themselves at the expense of SPS and its shareholders.

89.    By entering into this conspiracy, the Individual Defendants permitted, encouraged and induced all of the wrongful and tortious acts and omissions described above.

90.    Plaintiffs have suffered, and continue to suffer, severe, immediate, and irreparable harm, damage and injury by the wrongful acts committed in the course of the Individual Defendants' conspiracy.

### COUNT V
### UNJUST ENRICHMENT
### (Individual Defendants)

91.    The foregoing allegations are incorporated by reference as though fully set forth herein.

92.    The Individual Defendants knowingly accepted and retained the benefits described above, including, but not limited to, WWH's investments in SPS and the loans to SPS and Faircloth.

93.    The Individual Defendants were unjustly enriched by the acceptance and retention of these benefits, and it would be inequitable to allow them to continue to retain these benefits.

94.    Plaintiffs claim as damages the unjust enrichment the Individual Defendants realized at the expense of Plaintiffs, who received no dividend, distribution, or other return on their substantial investments and no repayment of their loans.

**COUNT VI**
**WASTE**
**(Individual Defendants)**

95.    The foregoing allegations are incorporated by reference as though fully set forth herein.

96.    The Individual Defendants wasted SPS's money, assets, and property by, among other things: (a) failing to comply with Alabama law regarding corporate governance, including failing to hold annual shareholders' meetings or elections for members of the Board; (b) wrongfully paying themselves excessive distributions and siphoning off SPS's corporate funds; (c) failing to pursue any legitimate business opportunities on behalf of SPS; (d) failing to protect SPS's

valuable intellectual property, including the Patents; (e) terminating SPS's relationship with the referenced law firm; (f) distributing corporate funds from SPS to themselves without providing WWH its pro-rata return; (g) wrongfully withholding dividends and/or distributions from WWH; (h) using SPS's assets for their own benefit to the exclusion of the other shareholders; (i) entering into self-dealing transactions for their own benefit; (j) failing to maintain financial and corporate records; (k) denying shareholders and Board members access to financial and corporate records; and (j) otherwise operating SPS as their alter ego.

97.    There has been no disclosure, examination, or approval by a majority of disinterested, independent, and objective members of SPS's Board (nor could there be at this time) as to the fairness of the above-described actions.

98.    As a result of the Individual Defendants' waste of SPS's money, assets, and property, WWH has suffered substantial monetary damages.

### COUNT VII
### REMOVAL OF DIRECTORS
#### (All Defendants)

99.    The foregoing allegations are incorporated by reference as though fully set forth herein.

100.    Section 10-2B-8.09 of the Alabama Code provides for judicial removal of directors in a proceeding commenced either by the corporation or by shareholders holding at least ten (10) percent of the outstanding shares of any class

if the Court finds that "(1) the director engaged in fraudulent or dishonest conduct, or gross abuse of authority or discretion, with respect to the corporation and (2) removal is in the best interest of the corporation."   Section 10-2B-8.09 also authorizes the Court to "bar the director from reelection."

101.   As set forth above, WWH holds 13.5% of the voting shares of SPS.

102.   The conduct of the Individual Defendants set forth above, including their breaches of fiduciary duty, corporate mismanagement, and waste of corporate assets, exceeds the standard for removal under Section 10-2B-8.09.

103.   As a result of the Individual Defendants' misconduct set forth above, WWH requests that the Court remove them as directors of SPS and order that they not be permitted to be reelected as directors of SPS.

### COUNT VIII
### TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF
### (All Defendants)

104.   The foregoing allegations are incorporated by reference as though fully set forth herein.

105.   Pursuant to Rule 65 of the <u>Federal Rules of Civil Procedure</u>, WWH asks this Court to enter an immediate order:

1.   Enjoining the Individual Defendants from making any payments to any officers, shareholders, or directors of the Company.

2.   Enjoining the Individual Defendants from liquidating, encumbering, borrowing against, withdrawing, or transferring to another the assets of the Company, or otherwise dissipating the assets of the Company.

3.  Appointing a receiver with the power to receive monies, pay liabilities, preserve the corporate assets, and carry on the business of the Company until a full hearing can be conducted.

106.  The facts set forth above demonstrate that the Individual Defendants have engaged in gross mismanagement and breaches of their fiduciary duties.  By virtue of their control over the Board, they have complete control of SPS and all its assets.  Unless the Court enjoins the Individual Defendants from doing so, they will misappropriate any remaining corporate funds of SPS for their own personal use.  In addition, SPS's Patents are in a fast-developing area of technology.  If a receiver is not appointed to carry on the business of SPS, then SPS and its investors will forever lose the opportunity to exploit SPS's Patents.

107.  WWH has no adequate remedy at law because the damages it will suffer as a result of the Individual Defendants' failure to exploit SPS's technology are incapable of exact proof.

108.  Granting such injunctive relief will further the public interest because, as demonstrated by the Alabama Business Corporation Act, corporate mismanagement and waste to the degree the Individual Defendants are committing it is against the public policy of the State of Alabama.

109.  The harm caused by the Individual Defendants as a result of their corporate mismanagement and waste far exceeds any alleged harm caused as a result of any injunctive relief entered against Defendants and in favor of WWH.

33

## COUNT IX
### BREACH OF CONTRACT
**Loan from WWH to SPS**

110.   The foregoing allegations are incorporated by reference as though fully set forth herein.

111.   SPS has failed to repay a loan from WWH.  The interest rate for such loan is twelve percent (12%).   As of August 31, 2015, SPS owes WWH $114,670.08 pursuant to this loan giving credit to SPS for past payments made by SPS in cash and/or stock.

112.   WWH fully performed its obligations relating to the loan and has suffered substantial financial harm as a result of the breach.

113.   For the reasons stated above, the corporate veil should be pierced, and the Individual Defendants should be held personally and individually liable for the amount due on the loan to SPS.

## COUNT X
### BREACH OF CONTRACT
**Loan and Advance from WWH to Faircloth**

114.   The foregoing allegations are incorporated by reference as though fully set forth herein.

115.   Faircloth has failed to repay a loan and advance from WWH.  As of March 31, 2015, Faircloth owed WWH $162,000.00 pursuant to this loan and advance.

116.   WWH fully performed its obligations relating to the loan and has suffered substantial financial harm as a result of the breach.

**COUNT XI**
**BREACH OF CONTRACT**
**Loan from Paul Walker to Faircloth**

117.   The foregoing allegations are incorporated by reference as though fully set forth herein.

118.   Faircloth has failed to repay a loan from Paul Walker.  As of March 31, 2015, Faircloth owed Paul Walker $110,000.00 pursuant to this loan.

119.   Paul Walker fully performed his obligations relating to the loan and has suffered substantial financial harm as a result of the breach.

**COUNT XII**
**BREACH OF CONTRACT**
**Loan from CTS to SPS**

120.   The foregoing allegations are incorporated by reference as though fully set forth herein.

121.   SPS has failed to repay a loan from CTS. The interest rate for such loan is nine percent (9%).  As of March 31, 2015, SPS owed CTS $20,300.00 pursuant to this loan giving credit to SPS for past payments made.

122.   CTS fully performed its obligations relating to the loan and has suffered substantial financial harm as a result of the breach.

123.   For the reasons stated above, the corporate veil should be pierced, and the Individual Defendants should be held personally and individually liable for the amount due on the loan to SPS.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

1.     For equitable relief:

    a.   Enjoining Nelson, Faircloth and McQuaig from making any payments to any officers, shareholders or directors of the Company.

    b.   Enjoining Nelson, Faircloth and McQuaig from liquidating, encumbering, borrowing against, withdrawing, or transferring to another the assets of the Company, or otherwise dissipating the assets of the Company.

    c.   Enjoining Nelson, Faircloth and McQuaig from acting as officers or directors of SPS.

    d.   Appointing a receiver with the power to receive monies, pay liabilities, preserve the corporate assets, and carry on the business of the Company until a full hearing can be conducted.

2.     For compensatory, punitive, exemplary and treble damages against the Individual Defendants, jointly and severally, yet to be determined but in excess of $2,000,000.00.

3.     For Plaintiffs' costs in this action.

4.     For Plaintiffs' reasonable attorneys' fees incurred in this action.

5.     For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs request a trial by struck jury as to all claims so triable.


Respectfully submitted this 24th day of September, 2015.


/s/ Brent C. Gray
Brent C. Gray, TN BPR # 23653
THE WATERFORD LAW GROUP, PLLC
2550 Meridian Blvd., Suite 350
Franklin, Tennessee 37067
T: 615.373.2500
F: 615.373.2574
bgray@waterfordlaw.com


Walter A. ("Tod") Dodgen (DOD016)
MAYNARD, COOPER & GALE, P.C.
655 Gallatin Street
Huntsville, Alabama 35801
T: 256.551.0171
F: 256.512.0119
tdodgen@maynardcooper.com

Will A. Smith (SMI284)
MAYNARD, COOPER & GALE, P.C.
1901 6th Ave. N. Suite 2400
Regions/Harbert Plaza
Birmingham, Alabama 35203
T: 205.254.1000
F: 205.254.1999
wsmith@maynardcooper.com

**Served the following by certified mail:**

SecuredPay Solutions, Inc.
Reg. Agent: Roy T. Nelson
11119 County Road 88
Pisgah, Alabama 35765

Roy T. Nelson
11119 County Road 88
Pisgah, Alabama 35765

Chris Faircloth
7345 Zabulon Road
Macon, Georgia 31220

Steve McQauig
159 W Lakeview Drive NE
Milledgeville, GA 31059

## OATH

**STATE OF TENNESSEE**                    )
**COUNTY OF GILES**                        )

I, Paul Walker, individually and as a partner in WWH Investments and an authorized representative of Capable Technology Solutions, LLC, being first duly sworn, hereby make an oath that I have read the foregoing Verified Complaint for Damages and Injunctive Relief and that the facts contained therein are true and correct to the best of my personal knowledge, information and belief.

*Paul Walker*
Paul Walker

Sworn to and subscribed before me on this 2 2 day of SEPT. , 2015.

*William J. McNeese*
Notary Public

My Commission expires: 11/19/18

## OATH

**STATE OF TENNESSEE**            )
**COUNTY OF DAVIDSON**            )

I, Jeff Walker, as a partner in WWH Investments and an authorized representative of Capable Technology Solutions, LLC, being first duly sworn, hereby make an oath that I have read the foregoing Verified Complaint for Damages and Injunctive Relief and that the facts contained therein are true and correct to the best of my personal knowledge, information and belief.

_____
Jeff Walker

Sworn to and subscribed before me on this 23 day of Sept _____,
2015.

_____
Notary Public

My Commission expires: 7.2.18